Investigation Number 19-2395 Dillinger France S.A. v. United States. Mr. Mudd-Albott. Yes, Your Honor. Thank you very much. Our client, Dillinger France, is a custom producer of steel plate in France. They were involved in the anti-dumping duty investigation of cut-to-length plate from France. And we're challenging three aspects of the Department of Commerce's determination. Our first challenge is with the method the Department used to calculate the anti-dumping duty. Had the Department used their normal method for calculating anti-dumping duties, Dillinger would have received a rate of 0%, so no dumping. Instead, the Department used an exceptional method, the average transaction with zeroing, to calculate Dillinger's anti-dumping duty, and that resulted in a rate of 6%. Mr. Mudd-Albott, this is Judge Dyke. I'm a little confused by this argument, because as I read the regulation, 351.414, that where you have materials, the determination is based on a transaction-to-transaction comparison. Apart from the issue of the pattern, I think you've urged an average-to-average comparison, and so I don't understand how that's consistent with the idea that these are custom products. Shouldn't you be arguing that the correct comparison is transaction-to-transaction? Your Honor, the transaction-to-transaction method is rarely used by the Department, and it requires a whole other application to get... I don't think you're answering my question. Under the regulation, 351.414, it seems to say that if it's a custom product, you use transaction-to-transaction, and yet you're not arguing for that. Correct, Your Honor. Although the regulation, as I understand it, the default is always the average-to-average, and then you have to convince the Department to go to one of the other methods, and here the Department is using the exceptional method of the average-to-transaction. Under the average-to-average, we don't believe there is dumping, and there was indeed no dumping, and so the issue here is whether the Department can default from their normal average-to-average and use an exceptional method with the transaction. What the regulation says is the Secretary will use the transaction-to-transaction method only in unusual situations, such as when the product is, quote, custom-made. If you're right that this is a custom-made product, why isn't the transaction-to-transaction method correct, which you never argued for? Right. First of all, that would have required us to argue before Commerce the separate method and to show that this is exceptional and then argue about what custom is. What we mean by custom is it's made to order. Dillinger does not make a lot of plate in one and warehouse it for customers to purchase. Instead, they only melt the steel and roll the plate according to a specific customer order for what the customer needs on a specific project, whether they're building a bridge or building a skyscraper or building an offshore platform. That's what we mean by customized. The other problem is in these cases, they come by surprise. Nobody knows that an anti-dumping case is going to be filed. Within a few weeks after the investigation is initiated, you've already received a questionnaire response, and the questionnaire response is already geared towards presenting your data in an average-to-average basis. It's very hard to try to jump out of that methodology on a short timeframe, but be that as it may, we're arguing that they should have used the average-to-average and that the average-to-transaction exception is not applicable in this case. The department did themselves say that the transaction-to-transaction should have been used. In fact, when you look at the exception with the average-to-transaction, the wording of that exception says they also have to show why the comparisons could not be done under the average-to-average or the transaction-to-transaction, and they said they didn't have to state that on the transaction-to-transaction. That's not part of our case. We didn't appeal that part of their decision. The issue here is should the exception have been triggered? In order to trigger the exception, the statute is very clear. It's known as the targeted-dumping provision, and it says that you have to show that there's a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or periods of time. What the department did or what we argued below is they're not looking for any pattern, that this provision specifically uses the word pattern of export prices that significantly differ, and they only look at significant differences. In their determination, they basically confirmed that. In their determination in black and white, they said the pattern requirement necessitates only that there exist significant differences in prices. So here they're saying that they're basically reading the word pattern of export prices out of the statute, and that's precisely our problem. It's a very precise issue of statutory construction. The department has a lot of discretion to interpret the statute, but they cannot interpret the statute in a way that renders specific words meaningless, and that each word in the statute should be given its normal, plain meaning. The plain meaning of pattern, and this is in all the dictionary citations, both in our brief and the government's brief, they all come to the conclusion that pattern means a discernible sequence or arrangement. So it's not enough to just show that there's price differences. You have to show that it falls into some sort of discernible sequence or arrangement. We have read all the jurisprudence of this court, of the CIT. This issue has not been raised before, and in the briefing, that has not been disputed, that this specific issue of statutory construction has not been before the court before. And the government seems to say that it's a question of they don't have to show intent, and we're not saying that they have to show intent to mass dumping. They just have to show that there's a pattern from the evidence. So that's clear from the statute, and that would be our position that just on basic terms of statutory construction, the department did not properly apply the exception. The next point on this exception is the legislative history in the Statement of Administrative Action also says that commerce will proceed on a case-by-case basis, looking at whether there's a pattern of significant price differences. And it specifically says because small differences may be significant for one industry or one type of product, but not for another. And we argue that because each of our plates are made to order, of course there's going to be price differences between different orders, between different time periods, that they have to take that type of product and that type of differential pricing methodology, and they've always applied the same thresholds in every single case. And this methodology was first developed in a case about nails. And while the thresholds might make sense for a commodity product like nails, they don't make sense in a case for a custom-made plate that can be made for pipelines and various other things. So the applying this exception. The next point has to do with the cost of production that we reported for non-prime plate. And non-prime plate is plate that doesn't meet the customer's specifications. This case is direct, or IPSCO, decided previously by the court, is directly on point here. And what IPSCO said is where you have two products that are being made by the same process that have the same inputs, and you don't know until the end of the production process which is going to be prime and which is going to be non-prime, the actual cost of production of both of those plates are the same. And you need to report the actual cost of production. It's also in the statute, 1677B3, specifically says that the cost of production is an amount equal to the cost of material, to fabrication, to other processing. And that's exactly what Dillinger reported for the non-prime plate. But Commerce required Dillinger to instead of reporting the cost of the plate, they required them to report the sales value of the plate as a surrogate for the cost. And that is directly against the court's decision in IPSCO. I see, I hear from the town that I'm getting into my rebuttal time. Unless there are any questions, I'll stop here and reserve the rest of the time for rebuttal. Okay, is there any other major point you want to make in your argument in chief? The last point has to do with the level of trade. And the last point on the level of trade is that the statute says that Commerce has to compare the prices in the foreign market and the home market based on the same level of trade. And this court in Micron and in the department's regulation all agree that level of trade means a stage of marketing and that the stages of marketing are clear. You start with the producer, so sales directly from the producer. The next stage of Dillinger showed that they had two levels of trade. One was direct sales from their factory and the next one was sales that they made to a related service center that inventoried the plate and then cut it into smaller pieces and then sold that. And there's no evidence how that is not a distributor or a reseller, that this separate company has their own sales force, has their own logistics, has their own production and cutting. And this is indeed meets all the marks of a separate level of trade and the department erred in treating it as the same level of trade as direct sales from the factory. Okay, thank you. Any questions at this point for Mr. Murdoch-Blatt? All right, then we'll hear from the other side. Counsel for the United States, Ms. Grishniak. Thank you, Your Honor. I'll discuss first the differing price methodology. The methodology that the Department of Commerce has developed here is a reasonable exercise of the discretion that has been granted to it under the statute. This court has reviewed, as Mr. Montalbain indicated, almost every other element of the differing pricing methodology, or DPM, that Commerce has employed. And this is a narrow carve-out that they have identified that has not been specifically approved by this court. However... Wouldn't Commerce, if this were custom-made products, wouldn't Commerce apply the transaction-to-transaction method under the regulation that I cited earlier? Pursuant to the regulation, that could be that these are not necessarily custom products within the scope of that regulation, but more runs of steel that are made to certain specifications. And I would actually direct the court to page 38 in the appendix, where the trial court did note specifically this issue. Dillinger actually did initially argue in its opening brief before the trial court that Commerce should have used T-to-T, but ended up abandoning that argument. So that's just simply not an issue before this court. But I do think it highlights that these are not necessarily items that are as custom, I think, as some of the briefing from Penitentiary College might indicate. And, you know, the statutory language that Commerce is addressing here says that Commerce needs to determine whether there is a pattern of expert prices for comparable merchandise that differs significantly. The three-part test in and of itself determines whether or not there is a pricing difference over the subject period of review. And the very narrow definition urged by Dillinger is essentially that there needs to be some sort of connection made by Commerce. You know, it needs to be all the same geography, or they only dump in November, or, you know, some sort of connection needs to be made by Commerce, other than the fact that there just is significant differencing in pricing. And I do think it's important to take a slightly closer look at the Cohen's D analysis. The thresholds of the analysis are not something Commerce came up with arbitrarily, but rather those that were assigned by the mathematician, Dr. Cohen, who developed this methodology. And the point of the methodology is that it can detect small price changes when those are important in the great scope of the data presented, or it can detect large changes, depending on, again, the standard deviation and the statistical analysis of all of the data. And in fact, this court actually rejected an exactly opposite argument in the Midcontinent Steel case just last year, where essentially a steel producer argued that because a half a penny price change per kilogram can be a significant, can be tagged as potential dumping by the Cohen's D analysis, the thresholds were too difficult to meet. And this court rejected that, saying that in accordance with the language in the FAA, that those small differences might be really important in a nails case, whereas when we're talking about plate steel like here, likely a half a pound or half penny change per kilogram is not going to be significant price change. And so the practice that Commerce has developed is in accordance with the significant discretion given to it under the statute. And we would also note that, you know, pattern identification could be inherently subjective, you know, especially if we're talking about the kind of patterns that Dillinger seems to be urging, you know, some sort of geographic connection, something along those lines. By virtue of using the same pattern identification could potentially be subjective, Your Honor, if it were an analysis that Dillinger seems to urge, i.e. some sort of connection between timing or, you know, what if we're saying they only dump to customers in the South, well, which states are considered the South? And so by using this mathematical statistical analysis, I didn't hear dumping, but rather the pattern requirement that they urge while conceding that there is no requirement to find intent, it does, you know, I think, it would force Commerce to thread a very difficult needle wherein how do you make the determination that there's a pattern of dumping to, you know, states in a given region or at a given time of year or to a given customer without, you know, essentially making the indication that they intended to make that move. And, you know, we would submit that that is perhaps that could be a reasonable exercise of Commerce's discretion under the statute, but it does not mean that the practice that they currently have is unreasonable. Okay. Could I take you to the prime, non-prime issue before we run out of time here? Certainly, certainly. As I understand it, you used the Dillinger books and records to assign the cost between prime and non-prime, and you rely on the statute as authorizing that, but I think the record shows pretty clearly that the Dillinger books and records are based on price allocation rather than cost allocation. So how is Commerce's approach consistent with the statute, which says that you should use books and records that, quote, reasonably reflect the costs associated with the production and sale of the merchandise, close quote? Certainly, Your Honor. This was a price allocation, price-based allocation rather than cost-based allocation, so how is that proper under the statute to use the books and records under those circumstances? Certainly, Your Honor. I think in a very short answer, the lower of cost or market principle is the reason why it's reasonable, and this is a principle that is required for gap compliance. I don't understand the answer. I mean, we have a specific provision here which says costs from the, I'm sorry, the books and records will be used if they reasonably reflect the costs of production. But here, the books and records do not, the allocation does not reflect the cost of production, but rather price. Right, Your Honor. So again, if I may just briefly explain the lower of cost or market principle, which is a gap-required principle. It is a principle that says that you have to track the cost of your inventory based on either the cost of actually producing it or its market value, and it's a principle to ensure that companies do not over-inflate the value of their inventory or potentially under-inflate it. And I would note that the full language of the statute the Court was just referring to reasonably reflects the costs associated with production and sale of merchandise. This does not say actual costs. And actually, just on the page directly before this statute under subsection E, 2.1, it does, Congress there asks for, quote, the actual amount incurred and realized. So if it were actual cost of production, that is something that Congress could have written into the statute. And again, I keep coming back to the lower of cost or market principle because... I'm sorry, I don't understand your answer at all. I mean, the statute, the allocation here in the Dillinger books and records is a price-based allocation, correct? It's an allocation based on anticipated value on the market. Right, so price-based. Okay. So why doesn't the statute say that you can't use the books and records under those circumstances because they have to be cost-based? Because the allocation as Dillinger did it is in accordance with GAAP principles. And that's where I think the lower cost of market principle, again, is important because it would make this provision of the statute internally inconsistent if by virtue of following the inventory requirements of the lower cost of market principle, you no longer can rely on those books. Well, I would read the statute as imposing alternative requirements. It both has to be in accordance with GAAP and to reflect cost. So if one of those things is not true, you can't use the books and records. I would direct the court to the court's decision in Thai Pineapple from 1999. The statutory language was codified after the period of review at issue there, but the court does specifically talk about the statutory language in footnote five. And note that statutory language tracks Congress's prior position that had been affirmed in the NTN case by this court. And there the court held it for a very similar reason. There it was the pineapple producers who said that the allocation in their actual books had no relation to the market. It was just completely random with regards to canned pineapple versus juice. Commerce took a look at the records and said, well, actually, there's some pretty consistent pricing here. You generally associate 9% to 18% of the cost with the juice and you get the rest of the pineapple. So rather than adapting the weight-based system that the respondent there was urging, Commerce determined that, no, you have assigned value to the juice in the book, so we can rely on these books. And this court found that that was a reasonable interpretation of, again, at that time it was Commerce's practice that was then subsequently codified by statute in 1996. So not applicable to the Thai Pineapple decision, but already at issue there, if that makes sense, Your Honor. And just to quickly distinguish the ISCO case that Plaintiff relied on, obviously that case from 1992 does predate the statutory language here in Act 1. And at Case 1061 of that, the court specifically quoted language from Commerce, noting that, notwithstanding the fact that we're talking about prime and non-prime pipes here, there the non-prime pipe could largely be used for almost all of the same activities and production purposes as the prime pipe, which is simply not the case here, as we made clear on the record. The non-prime pipe is sold without warranty. It seems to have almost no marketable use other than, I think, kind of weighing down or covering up manholes in construction processes. So they're completely different products and it is much more akin to the Thai Pineapple case in this court in 1999. And just to briefly touch on the level of trade argument, Mr. Maltavini said that there is no evidence on the record that this was not a separate distributor. That completely shifts the burden here. Importers are not entitled to a level of trade distinction. Rather, it is something that they can place information on the record, establishing why they are entitled to that level of trade distinction. And I would refer the court specifically to some of the arguments that were presented by Zillinger, which are essentially circular. They are essentially saying, because it's a distribution center, therefore it's a distribution center and another level of trade. Compare that to the facts of the case in Pastizara, this trial court decision upon which they placed a lot of emphasis. And if the court actually reads the facts that were being argued there as far as the distinction between levels of trade, there the manufacturer was saying, you know, we have two different sales operations. One deals with large manufacturers, many of whom have their own factories, their own trucks, their own distribution model. The other person deals with local mom and pop shops and restaurants that are within a close radius of our factories here in Italy. Because we deal with these smaller customers, we have to have the capacity to accept payment in cash and to deal with bounced checks if they occur from these small producers. All of this detail is given as to why these are actually significantly different levels of trade. And as we noted in our brief, in Pastizara 1, the trial court did remand for further consideration of those factors. However, upon remand, I hear my time is up. I'll just quickly finish my point if I may. After the remand, the trial court sustained the determination that there was only one level of trade. Okay. Thank you. Thank you, Your Honor. If there's no further questions, we respectfully ask that the court confirm the decision of the trial court. Okay. Any questions from Christia? All right. Ms. Galdas, you have three minutes. Thank you, Your Honor. May it please the court, Cynthia Galdas for defendant Napoleon New Corp Corporation. Your Honor, the government has thoroughly demonstrated why commerce's determination on the issues before you are supported by your counsel as well. Could you address my point, please, about the prime non-prime? I just don't understand. I mean, the statute doesn't say that you can use the books and records if they're merely consistent with a gap. It says you've got to show that it's consistent with a gap and reflects the cost of production. Right. Well, Your Honor, if this is at all I did want to point out that commerce's reliance on that lower value of non-prime products was fully consistent with the language of BS, which is the books and records, because Dillinger specifically told commerce, and I'm looking at appendix pages 578 and 2897, which is a copy of one another, specifically told commerce that it valued non-prime products in its cost accounting system at their estimated likely selling price. And it also said, quote, the basis for the cost of second choice plates. And so, you know, throughout the investigation, Dillinger specifically represented that these values that it was assigning to non-prime products were equivalent to cost. And so, with that in mind, you know, Dillinger provided this information itself. Commerce relied on the information and found the cost reasonable, particularly... Wait, wait, wait, wait, wait, wait. Yes. You know, they're all talking too fast. How, where did they concede that their books and records were equivalent to cost? Right. So, that's appendix 578, which is also the same page as 2897. So, you can flip to either side. And that's in their section D supplemental questionnaire response. That's where they have the... That's where Dillinger reported the language and reported that... Wait, wait, wait, wait, wait. Go ahead. So, okay. I'm looking at 578. Where do they say it's equivalent to cost? All right. I'll turn to it as well. Top... Under question seven, answer. This is the CO module. Dillinger France calculates the cost of all choices. Dillinger France values the second choice plates that's non-prime based on likely selling price for inventory purposes. And this is where we go. This is also the basis for the cost of second choice plates. Yeah, but that's not saying it's equivalent to the cost of production. It's saying that's the way they calculate costs based on price. Right. That's how cost is reflected in their books and records, Your Honor. Well, that's a problem because it doesn't seem to be consistent with the statute. May I ask Your Honor for clarification? It... The statute says that you use the books and records if they are consistent with GAP and, quote, reasonably reflect the costs associated with the production and sale of the merchandise. So, it's recognizing that there are some circumstances in which the books and records are not reflecting the actual cost and that they're done on some other basis. As in IPSCO, here that other basis is price. And I'm just not understanding how that can be consistent with the statute. Well, Your Honor, the... What they... Oh, my time is up. No, please answer. Please answer the question. Right. So, our view is that it is entirely consistent with the statute's language. I mean, the language does mention production and sales. And these are likely, you know, estimated likely selling prices. And furthermore, it's how Dillinger considers its costs in its own record. So, we see it as entirely consistent with the statute. Okay. Any more questions for Ms. Galvin? Okay. Then we're ready for rebuttal from Mr. Muldaubine. So, one issue on the pattern issue, or one point on the pattern issue, the government still has not said what pattern means or how its methodology looks at any pattern other than it just looks at significant price differences. And the statute says what it says, and each word needs to have meaning. On the non-prime issue, I agree with Judge Dyke's argumentation or reading of the statute. I would dispute... I wouldn't call that argumentation. I'm sorry, Your Honor. Yes. Excuse me. Your reading of the statute. That... that counsel read says that that's how the costs are. I think it's a little bit misunderstanding what value and what cost means, which says that they're valued at their selling price, and that's taken over as the cost. There cannot be any dispute, and nobody has ever disputed that the actual cost of production for prime and non-prime plate are the same. They have the exact same materials. They have the exact same labor. They have the exact same processing. It's not until the very end of the assembly line that you can tell what's going to be prime and what's not going to be prime. So, the actual costs are the same for the two, and Dillinger properly reported that. Also, the statute asks for the actual cost, and that's exactly what we've given. There's no place where the statute says that sales value for subject merchandise can be... can replace the cost. The pineapple case was a totally different situation where you had co-products. One was subject and one was non-subject. You had the fruit and you had the juice, and they had a joint raw material, and the only question in that case was how do we allocate this joint raw material to these two products, one subject and one non-subject. There, the statute is not clear, but for two products of different grades that are both subject merchandise and are both made in exactly the same process, the statute is clear you need to use the actual cost. IPSCO is directly on point. There's nothing in later amendments to the statute that change IPSCO. In fact, when this provision F1 was enacted, the provision B3 was also enacted. I see that the provision B3 was also enacted, and B3 specifically says that the cost of production shall be the sum of materials, processing, and all transformation costs, and that's exactly what we reported here. It's totally in line with the statute. So, unless there are any other questions, we would ask that the court reverse the judgment of the CIT and that the case be remanded to the Department of Commerce. Any more questions for Mr. Murdoch? All right. Thanks to all counsel. The case is taken under submission, and that concludes this panel's arguments for this morning. Thank you very much. The Honorable Court is adjourned until tomorrow morning at 10 a.m.